**E-FILED**

Wednesday, 12 April, 2006 01:13:12 PM
Clerk, U.S. District Court, ILCD

# United States Court of Appeals

## For the Seventh Circuit

### Chicago, Illinois 60604
**NOTICE OF ISSUANCE OF MANDATE**

DATE:    April 11, 2006

TO:    John M. Waters
       United States District Court
       Central District of Illinois
       Suite 218
       201 S. Vine Street
       U.S. Courthouse
       Urbana, IL  61802-3369

**FILED**

**APR 1 2 2006**

JOHN M. WATERS, Clerk
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA, IL

FROM:    Gino J. Agnello, Clerk

RE:    05-1721
       USA v. Adamson, Shawn D.
       04 CR 20036, Michael P. McCuskey, Chief Judge

       Herewith is the mandate of this court in this appeal, along
       with the Bill of Costs, if any.  A certified copy of the
       opinion/order of the court and judgment, if any, and any
       direction as to costs shall constitute the mandate.

       [ ] No record filed
       [X] Original record on appeal consisting of:
**ENCLOSED:**                              **TO BE RETURNED AT LATER DATE:**
       [1]    Volumes of pleadings              [ ]
       [ ]    Volumes of loose pleadings        [ ]
       [1]    Volumes of transcripts            [ ]
       [ ]    Volumes of exhibits               [ ]
       [ ]    Volumes of depositions            [ ]
       [1]    In Camera material                [ ]
       [ ]    Other_____  [ ]

              _____
              Record being retained for use     [ ]
              in Appeal No. _____

       Copies of this notice sent to:        Counsel of record
       [X]    United States Marshal
       [X]    United States Probation Office
**NOTE TO COUNSEL:**
       If any physical and large documentary exhibits have been filed in
       the above-entitled cause, they are to be withdrawn ten days from the
       date of this notice.  Exhibits not withdrawn during this period will
       be disposed of.

       Please acknowledge receipt of these documents on the enclosed copy
       of this notice.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
       Received above mandate and record, if any, from the Clerk, U.S.
       Court of Appeals for the Seventh Circuit.
Date: _____4/12/06_____        __s/V. Ball_____
(1071-120397)                                 Deputy Clerk, U.S. District Court

# United States Court of Appeals

## For the Seventh Circuit

## Chicago, Illinois 60604

### JUDGMENT - WITH ORAL ARGUMENT

CERTIFIED COPY

**Date: March 20, 2006**

**BEFORE:**  Honorable KENNETH F. RIPPLE, Circuit Judge

Honorable TERENCE T. EVANS, Circuit Judge

Honorable ANN CLAIRE WILLIAMS, Circuit Judge

No. 05-1721

UNITED STATES OF AMERICA,
            Plaintiff - Appellee
    v.

SHAWN D. ADAMSON,
            Defendant - Appellant


Appeal from the United States District Court for the
Central District of Illinois, 201 S. Vine Street
No. 04 CR 20036, Michael P. McCuskey, Chief Judge


        The judgment of the District Court is AFFIRMED,
    in accordance with the decision of this court entered on this date.


(1061-110393)


A True Copy:
    Teste:

Clerk of the United States
Court of Appeals for the
Seventh Circuit

## CERTIFIED COPY

### In the
# United States Court of Appeals
## For the Seventh Circuit

No. 05-1721

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

SHAWN D. ADAMSON,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 04 CR 20036—**Michael P. McCuskey,** *Chief Judge.*

ARGUED DECEMBER 14, 2005—DECIDED MARCH 20, 2006

Before RIPPLE, EVANS and WILLIAMS, *Circuit Judges.*

RIPPLE, *Circuit Judge.*    While investigating suspected drug activity at a motel in Mattoon, Illinois, police detained convicted-felon Shawn Adamson and discovered a .22 caliber handgun in his possession. Mr. Adamson was charged with being a felon in possession of a firearm. *See* 18 U.S.C. § 922(g)(1). He moved to suppress the handgun as the product of an unreasonable search and detention. The district court denied his motion. Adamson then pleaded guilty and was sentenced to 24 months' imprisonment. On appeal, he challenges the district court's denial of his motion to suppress. For the reasons set forth in

the following opinion, we affirm the judgment of the district court.

## I

## BACKGROUND

### A. Facts

The facts pertaining to this appeal arise out of a routine home visit conducted by probation officers of a probationer's motel room at Hannah's Inn in Mattoon, Illinois. In the room, the officers discovered drug residue and paraphernalia and noticed several individuals hastily leaving the motel through a back exit. Together with local police, the officers began questioning these individuals. In this group was Adamson, who, when police found him, was clutching what appeared to be a bundle of clothing. A pat-down search of Adamson and his parcel revealed a handgun wrapped in a pillowcase. At the hearing on Adamson's motion to suppress, the district court heard testimony from the police officers involved in the encounter with Adamson and from several witnesses called by the defense. The testimony conflicted. We first shall set forth the story presented by the officers and then describe the account of the defense witnesses.

### 1. The Officers' Testimony

At the suppression hearing, probation officer Steve Kelly, Mattoon police officers Brad Gabel and Jeremy Clark and Auxiliary Sergeant Steve Newlin testified for the Government. Kelly testified that he went to Hannah's Inn with a few other probation officers to conduct a home visit for a probationer who resided there. The officers also

were looking for a second probationer, who was the subject of an outstanding warrant. The probation officers first spoke with a motel employee who told them that the second probationer was staying in the motel and was currently in a room with four other people: "two black males and a couple white individuals." R.45 at 8, 10. The probation officers went to that room, where they found drug residue and paraphernalia. The probationer, who was the subject of the home visit, was alone in the room. He admitted that, just prior to the officers' arrival, he had been using drugs with some other individuals, but he declined to identify them.

Kelly, hoping to find the probationer with the outstanding warrant, then left the motel room in search of the others. He observed four individuals—two black men, a white man and a white woman—leaving the motel through a back exit "the minute" he stepped outside the motel. Kelly recognized two of the men, Adamson and Darryl Ferrell, as former probationers. The officer had been involved in "a violent incident" with Ferrell in the probation office on a previous occasion and had participated in a home visit when Adamson was a juvenile probationer. Kelly knew that both men had prior felony convictions.

As he approached the four individuals, Kelly noticed that Adamson was clutching what appeared to be a white bag, as well as some clothing, "very tightly in front of his chest and . . . seemed to wrap around it and be very concerned." *Id.* at 12. Kelly testified that he knew from "community reports" that Adamson "was known to be carrying and at times brandishing a firearm." *Id.* at 13. Kelly asked the two individuals that he did not recognize for identification; they refused. He then asked all

four individuals if they were motel residents, and one of them replied affirmatively. Kelly stated that Adamson "was acting a little bit differently than my prior encounters with him," *id.* at 15-16; instead of acting "very argumentative, profane, basically telling me where to go," *id.,* he was nervous. Kelly radioed the Mattoon Police Department and asked the dispatcher to send a squad car. He asked Adamson and his companions to "stand by until we could sort through the situation with the crime scene in the room." *Id.* at 17. Kelly testified that there was "no objection whatsoever" and that all four individuals followed his request. *Id.*

About ten minutes later, Officer Gabel arrived at the motel. Kelly told Gabel that, based on his past experience with Adamson and Adamson's behavior that day, he was "very suspicious" that Adamson might be armed. Immediately, Gabel recognized Adamson from prior encounters and knew that he was a convicted felon. After the probation officers apprised him of the situation, Gabel obtained identification from each of the four and contacted the police dispatcher to check for outstanding warrants. Adamson told Gabel that he did not have any drugs or weapons on his person, but that Gabel could not "check him."

Within ten minutes, Officer Clark and Sergeant Newlin arrived on the scene. Shortly after their arrival, "someone mentioned that there was a possibility of a weapon from a report that happened the night before." *Id.* at 19. Clark asked Adamson whether he minded if Clark searched him for weapons and, according to Clark's testimony, Adamson replied, "Whatever." Clark then asked Adamson to put down the bundle he was carrying, and Adamson rested it in the bed of a pickup truck.

After Adamson placed his hands on the side of the truck, Clark patted him down. Meanwhile, Kelly reached into the truck bed and ran his hand along the top of Adamson's bundle "to see if [he] could possibly feel the outline of a weapon inside the belongings." *Id.* at 20. When he ran his hand over the pillowcase, Kelly "immediately" felt the outline of a gun. Kelly told Newlin what he felt; Newlin also felt the pillowcase and verified that there appeared to be a gun inside. Newlin then informed Clark and Gabel that he and Kelly had felt a handgun in the bundle of clothing that Adamson had been carrying. At that time, Gabel handcuffed Adamson and formally arrested him for possession of a firearm by a felon. Once Adamson was in custody, Gabel and Clark "went through the clothing and removed the gun." *Id.* at 43.

## 2. The Defense Witnesses' Testimony

Mr. Adamson called two witnesses at the suppression hearing. First, Darryl Ferrell testified that he had spent the day of February 19 with Adamson and "a couple more people" drinking and playing video games in a friend's room at Hannah's Inn. They left when alerted to the presence of probation officers at the motel. As the group left through a rear exit, they were approached by Officer Kelly, who began to ask them questions. When Officer Gabel arrived on the scene, Ferrell testified, Adamson refused to be searched because he "wasn't on probation" and "didn't have any arrest warrants." *Id.* at 75. According to Ferrell, the two other individuals did consent to being searched. After Clark and Newlin had arrived on the scene, one of them "asked everybody" to be searched, and Adamson again refused, stating that he was not on probation and did not have any outstanding

warrants. Ferrell testified that Adamson was handcuffed and arrested before any of the officers patted him down. He further stated that Adamson did not have a gun with him that day and that he never saw the police recover any weapons from anyone on the scene. On cross-examination, Ferrell admitted that he previously had been convicted of aggravated battery against probation officer Kelly. Ferrell also admitted that he was drinking alcohol for several hours before the officers arrived at Hannah's Inn.

Shelby Guyette, the woman in Adamson's group that day, testified that she had been pulled aside by one of the probation officers and that "whenever I came back, they were searching [Adamson]." *Id.* at 91. She stated that Adamson refused to be searched but was told to set down his bundle of clothing and was searched anyway. After the officers searched Adamson and the clothing, Guyette testified, they placed him in handcuffs and arrested him. Guyette did not recall who searched Adamson or whether it was a police officer or probation officer.

## B. District Court Proceedings

After receiving closing arguments in written form, the district court denied Adamson's suppression motion. The district court found that Kelly, Gabel, Clark and Newlin were credible witnesses but that Ferrell and Guyette were not; the court contrasted Ferrell and Guyette's testimony with the "straightforward" and "consistent" testimony of the officers. In addition, Ferrell had admitted to consuming alcohol on the day of the incident, and he had a prior conviction for aggravated battery in connection with an altercation with Kelly. The district court

doubted the credibility of Guyette's testimony and her "ability to observe" because she had testified that she did not observe any evidence of drinking in the motel room despite Ferrell's admission that he had been drinking for several hours that day. The district court also cited the witnesses' "manner and demeanor" as reasons for discrediting Ferrell and Guyette.

The district court first concluded, based on Kelly's credible testimony, that Adamson had consented to wait in the parking lot with Kelly until police arrived. In the alternative, the court held that there was reasonable suspicion to believe that Adamson was involved in criminal activity because of Kelly's familiarity with Adamson and the motel employee's description of the individuals who had been in the room where probation officers discovered drugs and drug paraphernalia. Next, the court found that Adamson had consented to be searched when he answered, "Whatever" to Clark's request. The district court also concluded, in the alternative, that the officers had reasonable suspicion to pat down Adamson and the bundle he was carrying. The court cited Adamson's proximity to the motel room where drugs were discovered, the police report that he had brandished a gun the day before, his nervous demeanor and the fact that he seemed to be guarding his pile of clothing. The court noted that it would "defy logic" to conclude that the officers had reasonable suspicion to pat down Adamson's person but not the bundle he was clutching. The court denied Adamson's motion, and weeks later he pleaded guilty, reserving the right to challenge the denial of the suppression motion.

## II

## DISCUSSION

When evaluating the denial of a suppression motion, we review questions of law de novo and findings of fact for clear error. *See United States v. Banks*, 405 F.3d 559, 570 (7th Cir. 2005). Mr. Adamson directs his arguments at the district court's conclusions that there was reasonable suspicion to stop him and to pat him down. He first submits that the general description given to the probation officers, his proximity to the motel room where drugs had been found and Kelly's familiarity with him did not amount to reasonable suspicion to stop him. He also contends that the duration of the stop exceeded what is permitted for an investigative detention. Finally, Adamson argues that the frisk cannot have been conducted in the interest of officer safety because twenty-five minutes had passed between the initial stop and the pat-down.

### A.

Before addressing the contentions set forth in Mr. Adamson's opening brief, we must pause to note that, in that brief, he leaves unchallenged the explicit factual findings that he consented to remain with Kelly and to undergo the subsequent pat-down search. To the extent that Adamson mentions the district court's finding of consent at all, he baldly asserts that he was stopped and searched without consent. He does not contend, however, that the district court clearly erred in finding that he acceded to Kelly's request to "stand by" until police arrived and that he answered, "Whatever" in response to Clark's request for consent to search him' for weapons. These findings stem from the district court's decision to

credit the testimony of Kelly, Clark and Newlin over that
of Ferrell. Credibility determinations are factual in na-
ture and therefore are reviewed for clear error; a credibil-
ity determination will be found clearly erroneous "only
if the district court has 'chosen to credit exceedingly
improbable testimony.'" *United States v. Robinson*, 314
F.3d 905, 907 (7th Cir. 2003) (citation omitted); *see United
States v. Briggs*, 273 F.3d 737, 740 (7th Cir. 2001) (explaining
that a district court's decision to credit one witness over
another "can almost never be clear error"). Mr. Adamson's
mere assertion that he was stopped and searched without
consent is insufficient to undermine the district court's
credibility determination under the clearly erroneous
standard. *United States v. Huerta*, 239 F.3d 865, 872 (7th Cir.
2001) (stating that merely presenting a contradictory
statement of facts does not suffice to show that the dis-
trict court credited exceedingly improbable testimony).

In failing to challenge the district court's factual find-
ings that he consented to wait with Kelly and to be patted
down by Clark, Adamson also passes over any argument
with respect to the *scope* of his consent. The district court
found that Adamson consented to remain in the motel
parking lot "until police arrived." R.16 at 5. The Govern-
ment interprets this finding to mean that Adamson con-
sented to stay on the scene "while officers conducted a
drug investigation." Appellee's Br. at 16. Even after
learning the Government's view that his consent ex-
tended to the entire encounter—not merely until the
arrival of police—Adamson in his reply brief declines to
respond to the Government's expansive interpretation or
to its submission that the duration of the encounter is
irrelevant because it was consensual. He does not sug-
gest that his consent was limited in scope or was with-

10                                          No. 05-1721

drawn at any point, although he does hint that his con-
sent, if given, was not "voluntary." For its part, the Gov-
ernment states that the district court "found that the
defendant consented to a pat-down search for weapons
that included the pillowcase he was carrying." *Id.* at 37.
With respect to the search, the district court found that
Adamson "consented to a pat down search." R.16 at 6.
Again, Adamson does not dispute the Government's
understanding of the finding of consent or assert that his
consent did not extend to his parcel.

In light of Adamson's failure to challenge the district
court's factual conclusions, and the "near absolute defer-
ence" owed to the district court's credibility determina-
tion, *see United States v. Williams*, 209 F.3d 940, 943 (7th
Cir. 2000), we conclude that the district court did not
clearly err in finding that Adamson consented to wait
with Kelly and to be patted down by Clark.


## B.

We now shall address the district court's alternative
holding that the stop and pat-down search were independ-
ently justified by reasonable suspicion.

Mr. Adamson first contends that he was stopped initially
without reasonable suspicion. We believe that it is clear
that his initial interaction with Kelly was not a seizure that
implicates the Fourth Amendment.[1] It is well settled that

---

[1] Although Kelly is a probation officer rather than a police
officer, the Fourth Amendment applies to governmental actors
other than police officers, such as probation officers. *See New*
(continued...)

police may approach an individual in a public place and seek the individual's cooperation in answering a few questions. Such an encounter is not a "seizure" within the meaning of the Fourth Amendment. *See United States v. Broomfield,* 417 F.3d 654, 655 (7th Cir. 2005). In determining whether a stop is consensual, relevant factors include whether the encounter took place in public, whether the suspect consented to speak to police, whether the officers told the suspect that he was not under arrest and free to leave, whether the suspect was moved to another area, the number of officers present and whether they displayed weapons or physical force. *See United States v. Robinson,* 30 F.3d 774, 782 (7th Cir. 1994). Here, Kelly approached Adamson and his companions outside the motel and asked them some questions, some of which they declined to answer, as was their right. A reasonable person under the circumstances set forth in this record would have felt free to leave. *See id.* at 783. Because no "seizure" occurred when Kelly first engaged Adamson in conversation, reasonable suspicion was not required.

However, the encounter soon ripened into an investigative detention. *See Terry v. Ohio,* 392 U.S. 1 (1968); *United States v. Jackson,* 300 F.3d 740, 745 (7th Cir. 2002). Such a seizure is permitted when the police have reasonable suspicion, supported by articulable facts, that criminal activity is afoot. *Terry,* 392 U.S. at 21; *United States v. Baskin,* 401 F.3d 788, 791 (7th Cir. 2005). Contrary to Adamson's assertions, Kelly and the police officers who arrived later

---

[1] (...continued)
*Jersey v. T.L.O.,* 469 U.S. 325 (1985). Therefore, the cited cases, which primarily involve the actions of police officers, apply with equal force to Kelly.

had such reasonable suspicion. First, the motel was gen-erally viewed as a site of frequent criminal activity. Kelly stated that it "has a reputation in our county as to be somewhat of a drug hangout or . . . a 'no-tell motel,'" R.45 at 8, and Gabel testified that he is often dispatched to the motel to investigate various crimes. *See Jackson*, 300 F.3d at 746 ("An officer may also consider whether the location of the stop is a 'high crime area.'"). In addition, Adamson was among a group of individuals matching the motel employee's description of the group that had been in the room where the probation officers discovered evidence of drug activity. *See Broomfield*, 417 F.3d at 655; *United States v. Breland*, 356 F.3d 787, 791 (7th Cir. 2004). The probationer in the motel room told Kelly that he had been using drugs with other people who had just left, and immediately thereafter Kelly saw Adamson's group slipping out a back exit. Kelly and the police officers were all familiar with Adamson as a prior felon. *See Jackson*, 300 F.3d at 746. Kelly knew that Adamson was rumored to carry a gun, and this suspicion was con-firmed by a police report that Adamson had brandished a weapon the night before. *See United States v. Mitchell*, 256 F.3d 734, 737 (7th Cir. 2001). Finally, Kelly observed that Adamson appeared nervous and very concerned with the bundle he was clutching. *See United States v. Brown*, 188 F.3d 860, 865 (7th Cir. 1999). Under the totality of the circumstances, it was not unreasonable for Kelly to de-tain Adamson in connection with the investigation.

Mr. Adamson also contends that, even if there was reasonable suspicion for a *Terry* stop, the duration of the stop eventually rendered it a de facto arrest, requiring probable cause. *See Robinson*, 30 F.3d at 784. Adamson's argument lacks merit. There is no bright-line rule as to

No. 05-1721                                                13

how long an investigative detention may last; instead we
look to whether the police diligently pursued a means of
investigating that was likely to confirm or dispel quickly
their suspicions. *See United States v. Sharpe*, 470 U.S. 675,
685-86 (1985); *Robinson*, 30 F.3d at 784. Here, about twenty-
five minutes elapsed from when Kelly approached Adam-
son to when Adamson was formally arrested, and Adam-
son does not suggest that the police were not diligently
investigating the drug activity during this time. Kelly and
the police officers asked questions of motel residents and
employees as well as the detained individuals in order to
determine who had been in the room where the drugs and
paraphernalia were found. Given the number of subjects
and their reluctance to reveal their names and why they
were at the motel, twenty-five minutes was a reasonable
amount of time in which to investigate whether the four
detained individuals had taken part in the drug activity.

With respect to the discovery of the gun, the manipula-
tion of a person's effects from the outside is a "search"
within the meaning of the Fourth Amendment. *Bond v.
United States*, 529 U.S. 334, 338-39 (2000). To insure officer
safety, a protective search for weapons is permitted dur-
ing a *Terry* stop when police reasonably suspect that the
subject is concealing a weapon. *See Terry*, 392 U.S. at 29-30;
*United States v. Ford*, 333 F.3d 839, 843 (7th Cir. 2003). Mr.
Adamson, who does not take issue with the district
court's conclusion that, in this case, reasonable suspicion
would permit a pat-down of his effects as well as his
person,[2] argues only that the police must have lacked

---

[2] Mr. Adamson suggests for the first time in his reply brief that
officers lacked reasonable suspicion to pat down the pillow-
(continued...)

reasonable suspicion that he was armed because they waited too long between stopping him and patting him down.

The elapsed time is the only evidence Adamson cites in support of his position that the officers were not concerned with their safety at the time of the search. This argument addresses whether the officers, having not immediately patted him down, subjectively believed that he was armed. But reasonable suspicion is measured against the totality of the circumstances, and the test is objective. *See Ford*, 333 F.3d at 843. More importantly, however, the fact-specific inquiry into the existence of reasonable suspicion must be undertaken with due regard to common sense and practicality. *See Illinois v. Wardlow*, 528 U.S. 119, 125 (2000); *Ornelas v. United States*, 517 U.S. 690, 695-96 (1996); *United States v. Hagenow*, 423 F.3d 638, 642 (7th Cir. 2005); *United States v. Jerez*, 108 F.3d 684, 693 (7th Cir. 1997). With that in mind, we have no trouble concluding, based on the facts before us, that the officers were legitimately concerned with their safety at the time they patted down Adamson and his effects. The location of the stop, the officers' prior dealings with Adamson and Adamson's behavior—especially the nervous clutching of the bundle in his arms—contributed to reasonable suspicion that he was armed. Particularly after Clark and Newlin arrived with information about the previous

---

[2] (...continued)
case because he was not holding it and could not access its contents at the time of the pat-down. Arguments made for the first time in a reply brief are waived, *see United States v. Blaylock*, 413 F.3d 616, 619 (7th Cir. 2005), and in any event the argument is not developed.

night's incident during which Adamson had brandished a handgun, the officers had reason to fear for their safety. *See Jackson*, 300 F.3d at 746 (explaining that "officers were appropriately concerned for their safety" where they knew the subject was armed in the past). Accordingly, we conclude that the pat-down search was reasonable under the totality of the circumstances.

## Conclusion

The district court did not clearly err in finding that Adamson consented to the initial stop and to the pat-down search. Furthermore, the officers had reasonable suspicion that Adamson was involved in criminal activity and that he posed a threat to officer safety. Accordingly, the judgment of the district court is affirmed.

AFFIRMED

A true Copy:

Teste:

*Clerk of the United States Court of Appeals for the Seventh Circuit*

USCA-02-C-0072—3-20-06